UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ANTHONY WHITE,

              Plaintiff,

vs.

MICHIGAN DEPARTMENT
OF CORRECTIONS,

              Defendant.

_____/

Case No. 1:09-cv-188

Hon. Hugh W. Brenneman, Jr.


### OPINION

This matter is now before the court on defendant's motion for summary judgment (docket no. 13). For the reasons stated below, defendant's motion is granted.

### I.      Introduction

#### A.      Plaintiff's allegations

Plaintiff, Anthony White, is an African-American man and a corrections officer employed by the Michigan Department of Corrections ("MDOC"). Plaintiff sets forth the following allegations. The MDOC employed plaintiff as a corrections officer in or about April 1989. Amend. Compl. at ¶ 7 (docket no. 5). Over the next twenty years, in his employment as a resident unit officer (RUO), plaintiff received performance reviews rating him as "satisfactory," "meeting expectations" or "high performer." *Id.* at ¶ 8. During this time, plaintiff identified two disciplinary incidents which allegedly involved race discrimination. The first incident occurred in May 2007, when plaintiff was suspended for ten days for leaving his post while guarding prisoners at Sparrow Hospital. *Id.* at ¶¶ 11-12. The incident arose when plaintiff went to get food after a 12-hour shift. *Id.* at ¶ 11. The second incident occurred on or about October 4, 2007. At that time, while in the

Lansing area, plaintiff became upset when he saw his wife with another man in a car. *Id.* at ¶ 13.

A verbal confrontation took place when plaintiff asked why this man was driving his car. *Id.*

Plaintiff called the police to report that a man was driving his car and pointed a gun at him. *Id.* On

or about January 23, 2008, friends notified plaintiff that he was featured on a local "Crime Stoppers"

television program as having a felony warrant for filing a false police report. *Id.* at ¶ 14. Plaintiff

had no knowledge of the warrant. *Id.* at ¶ 15. Although the local police had plaintiff's address, cell

phone number and telephone number, they did not alert him to the outstanding warrant. *Id.*

Plaintiff turned himself in to the Lansing Police Department the next day and was released on his

own recognizance. *Id.* at ¶ 16.

Because of this arrest, the MDOC issued a "Stop Order" regarding plaintiff, posted

his picture at the workplace entrance, and suspended him without pay. *Id.* at ¶ 17. At the

employee's roll call "the next day," Deputy Warden Lt. Clark made an announcement that plaintiff

was on a Stop Order due to making a false police report. *Id.* at ¶ 18. According to plaintiff, "[t]his

had never been done before to any officer." *Id.* A co-worker drew a picture on the Stop Order to

make plaintiff look like the television actor "Mr. T." *Id.* at ¶ 19. A deputy warden allegedly took

this Stop Order to the facility's entrance, while mocking plaintiff in front of his co-workers. *Id.* The

Stop Order, with the picture depicting plaintiff as "Mr. T," was allowed to stay in place in violation

of MDOC policy. *Id.*

The charge against plaintiff for filing a false police report was dismissed when the

Lansing Police could not locate some of the evidence and the alleged victim failed to appear at the

criminal proceedings. *Id.* at ¶ 20. Nevertheless, on or about May 29, 2008, the MDOC terminated

plaintiff's employment. *Id.* at ¶ 21. Some weeks later, in July 2008, plaintiff, the MDOC and a

representative from the "Michigan Corrections Organization" entered into a 24-month "Last Chance Agreement" to allow plaintiff to return to work. *Id.* at ¶ 22. *See also*, Settlement Agreement (docket no. 14-11).[1]

Plaintiff filed a complaint in this court on March 5, 2009, which contained three counts: Count I (race discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2102 *et seq.* ("MCRA") ); Count II (hostile work environment in violation of the MCRA, M.C.L. § 37.2102 *et seq.*; and Count III ("Violation of Title VII - the Civil Rights Act of 1964 as Amended"). *See* docket no. 1.

Plaintiff filed an amended complaint on March 31, 2009, which dropped the state law claims and alleged two federal counts. In Count I ("Race discrimination in violation of Title VII - the Civil Rights Act of 1964 as Amended"), plaintiff alleged that his race was a determining factor in "Deputy Warden, Assistant Deputy Warden, Lt. Captain and the Shift Commander" allowing plaintiff's co-workers to ridicule him and in the Deputy Warden's participation in the ridicule. Amend. Compl. at ¶ 25. In addition, plaintiff's race was "a determining factor" in his disciplinary action and his employment termination. *Id.* at ¶ 26. Plaintiff alleged that "[s]imilarly situated white employees were not disciplined or fired for false allegations by persons outside the workplace." *Id.* at ¶ 27. In addition, "[s]imilarly situated white employees who were suspended were not the subject of announcements at Role [sic] Call." *Id.* at ¶ 28. In Count II ("Hostile work environment in violation of Title VII - the Civil Rights Act of 1964 as Amended"), plaintiff alleged that similarly situated white employees are not scrutinized like him "in every part of his work day" and are not

---

[1] The Michigan Corrections Organization (the "MCO") is the labor relations representative for corrections workers in Michigan. *See generally, Wise v. Michigan Civil Service Commission*, No. 268675, 2007 WL 240523 (Mich. App. Aug. 23, 2007).

disciplined like him for being late for work. *Id.* at ¶¶ 30-31. Plaintiff further alleged that if he "had

been a white employee, he would not have been treated in the manner described." *Id.* at ¶ 32. In

his claim for relief, plaintiff seeks an order enjoining defendant from further acts of discrimination

or retaliation; compensatory damages; liquidated damages; punitive damages; "an order of this court

removing the "Last Chance Agreement from [p]laintiff's employment file;" and attorney fees. *Id.*

at p. 7

### III.    Legal standard

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set

forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to
> support the nonmoving party's case. Once the moving party has met its burden of
> production, the nonmoving party cannot rest on its pleadings, but must present
> significant probative evidence in support of the complaint to defeat the motion for
> summary judgment. The mere existence of a scintilla of evidence to support
> plaintiff's position will be insufficient; there must be evidence on which the jury
> could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the

court views the factual evidence and draws all reasonable inferences in favor of the nonmoving

party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is

not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell

two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### IV.     Discussion

### A.     The EEOC claims

### 1.     Scope of the exhausted claims

Plaintiff's EEOC complaint alleged discrimination based on race, sex, age and disability, as well as retaliation. *See* docket no. 14-5. The EECO complaint alleged as follows

> I began employment with the above-named employer in April 1989, as a Corrections Officer E-9. I am currently employed as a Corrections Officer (RUOE-10).[2]

> On approximately May 22, 2008, my employment was terminated after my picture was posted on "Crime Stoppers" for a warrant which had been dismissed.

> On or about July 24, 2008, I was reinstated to my position. Since my return, I have been subjected to harassment by management. I was told that an investigation has been conducted regarding statements made against me by an inmate, who assaulted me. Caucasian employees are not treated in this manner.

> I believe I have been subjected to discharged [sic] because of my race, African American, sex, male, age, 46, disability, and harassed in retaliation for making complaints, in violation of Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, as amended, and the Americans with Disabilities Act of 1990, as amended.

*Id.* The EEOC issued a Notice of Charge of Discrimination to the MDOC on October 6, 2008, identifying race, sex and age discrimination, as well as retaliation. *Id.* After being unable to conclude that a statutory violation occurred, the EEOC dismissed the administrative action and issued a right to sue letter on December 4, 2008. *See* docket no. 14-16.

---

[2] The court notes that this date is one week earlier than the termination date of May 29, 2008, as alleged in the amended complaint.

Defendant contends that the court lacks subject matter jurisdiction over any claims of discrimination arising from the May 2007 incident at Sparrow Hospital. The court agrees. "It is well settled that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge." *Strouss v. Michigan Department of Corrections*, 250 F.3d 336, 342 (6th Cir. 2001). *See Weigel v. Baptist Hospital of East Tennessee*, 302 F.3d 367, 380 (6th Cir. 2002) (a plaintiff's complaint filed in the district court must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination). The only claims of discrimination within the scope of plaintiff's EEOC charge are those related to his employment termination on May 22, 2008, and the alleged harassment which occurred following his reinstatement on July 24, 2008, through December 4, 2008, the date that the EEOC sent plaintiff a right to sue ("RTS") letter. Where the EEOC issues an RTS letter following an investigation, the charge set forth in the letter limits the scope of the subsequent civil action to relief for discrimination that is reasonably expected to grow out of the charge set forth in the letter. *See Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir. 2006); *Conner v. Illinois Department of Natural Resources*, 413 F.3d 675, 680 (7th Cir. 2005). "Permitting claims to be brought in court which are outside of the scope of the EEOC charge would circumscribe the EEOC's investigatory and conciliatory role and deprive the charged party of notice of the charge." *Cottrill*, 443 F.3d at 634. Accordingly, this court does not have subject matter jurisdiction over any alleged discriminatory acts that arose from the Sparrow Hospital incident of May 2007 (*see* Count I, ¶¶ 11-12).

### 2.  Timeliness of plaintiff's Title VII action

Defendant contends that plaintiff's Title VII action is untimely.  The court disagrees. The RTS letter, dated December 4, 2008, required plaintiff to file his action within 90 days of the receipt of the letter.  *See* docket no. 14-16.  Plaintiff filed this action on March 5, 2009, i.e., 91 days after the date of the letter.  *See* docket no. 1.  There is no record of when plaintiff actually received the RTS letter.  The Sixth Circuit presumes that notice is given, and the 90-limitation runs, on the fifth day following the EEOC's mailing of the RTS letter.  *See Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557-58 (6th Cir. 2000) ("[t]he Sixth Circuit has resolved that notice is given, and hence the ninety-day limitations term begins running, on the fifth day following the EEOC's mailing of an RTS notification to the claimant's record residential address, by virtue of a presumption of actual delivery and receipt within that five-day duration, unless the plaintiff rebuts that presumption with proof that he or she did not *receive* notification within that period) (footnote omitted) (emphasis in original).  In the absence of any evidence to the contrary, the court presumes that plaintiff received the RTS letter on December 9, 2008, the fifth day following the presumed December 4th mailing date.   Accordingly, plaintiff's Title VII action was filed within the 90-day statutory limitation.

### 3.  Settlement of union grievances

Defendant contends that plaintiff's remaining claims are precluded due to the settlement of his union grievances. By way of background, plaintiff received an Employee Disciplinary Report, DS 2-51-0010-08, for his January 23, 2008 violation of MDOC Handbook Work Rule No. 5, "Conduct unbecoming a department employee."  Employee Disciplinary Report (docket no. 14-10).  The violation was described as "Employee's picture and felony information was

aired on Crime Stoppers." *Id.* Aggravating circumstances included "the fact that the Lansing Police Department had an available mug shot of Mr. White on file" and "having a mug shot along with an active felony warrant." *Id.* Plaintiff's previous disciplinary record included a written reprimand in 2003 (for violation of three work rules), a three day suspension in 2005 (for violation of two work rules), and a ten day suspension in 2007 (for violation of four work rules). *Id.*

A disciplinary conference was held on May 1, 2008, at which time plaintiff, a union representative, an inspector and the warden were present. *See* Memorandum (docket no. 14-9). The minutes of the conference indicated that plaintiff's mug shot and felony warrant information appeared on a Crime Stoppers report aired by a television station in Lansing. *Id.* Plaintiff stated that he was falsely accused and that he was unaware of the warrant. *Id.* When asked about why the police had a prior mug shot of him, plaintiff did not offer a clear answer as to when and why the mug shot was taken. *Id.* The warden determined that plaintiff's mug shot appearing on television was egregious enough to warrant disciplinary action. *Id.* In reaching this determination, the warden noted that according to reports from a Lansing Police Department detective, the Crime Stoppers program resulted in numerous telephone calls from plaintiff's co-workers and that "[u]ndoubtedly, many prisoners and others recognized [plaintiff's] name and photo." *Id.* After noting plaintiff's history of work rule offenses, and reviewing the facts of the present incident, the warden recommended that plaintiff be dismissed from employment at the MDOC. *Id.*

In Grievance MCO-51-0011-08, dated May 29, 2008, plaintiff stated as follows:

Grievant was unjustly terminated for being on crime stoppers for a warrant that he was unaware of and that the charge was later dismissed. The state aggravated the charge because the police department had a mug shot on file. It was on file from a misdemeanor that he [i.e., grievant] was already disciplined for and the state was aware of from 2005.

Docket no. 14-17.  Plaintiff requested "to be reinstated and made whole."  *Id.*

In July 2008, the parties entered into a written agreement which settled plaintiff's claims with respect to grievance MCO-51-0011-08, grievance MCO-51-0004-08, and the Employee Disciplinary Report.  *See* docket no. 14-11.[3]  The settlement agreement resolved plaintiff's grievances, providing in pertinent part as follows:

1.      As a resolution to this matter, the grievant, Anthony White's discharge shall be converted to a disciplinary suspension on the record for the period of May 23, 2008 through July 12, 2008.  The grievant will be reinstated to an E-10 position, on the 2-10 shift, at Parnall Correctional Facility. . . .

3.      The grievant will be entitled to a one time lump sum of $3000.00, and his sick leave balance shall be reinstated with the balance of hours of sick leave the employee had available prior to his dismissal.  . . .

6.      Settlement of this grievance is freely made, without duress or coercion and does not constitute an admission on the part of the Employer that a violation of the CBA, Civil Services Rules or Regulations has occurred.

7.      MCO and Anthony White agree to withdraw the above referenced grievances.

8.      This settlement constitutes a full and binding agreement of the parties, provides for a full resolution of said grievances, is not precedent setting, and shall not be used or referenced in relation to any other case, regardless of similarity.

*Id.*

Defendant contends that plaintiff's Title VII race discrimination claims are barred by this settlement agreement, citing *Morris v. Alcan Foil Products, Division Alcan Aluminum*

---

[3] Plaintiff signed the agreement on "7-10-08" and Lori Fedewa, a representative of the Michigan Department of Corrections, signed the agreement on "7-11-08."  *See* docket no. 14-11.  John Bowers of the Michigan Corrections Organization also signed the agreement (although the date of his signature is illegible).  *Id.* The record does not include a copy of grievance MCO-51-0004-08.

*Corporation*, No. 95-5673, 1996 WL 614353 (6th Cir. Oct. 23, 1996).  The court disagrees.  While

*Morris* involved the settlement of union grievances, it is factually distinguishable from this case.

In  *Morris*, the plaintiff  filed two union grievances against her employer to contest the termination

of her employment.  In the first grievance, the plaintiff alleged "harassment, discrimination, and

continuing unfairness" because the employer allegedly retaliated against her for filing a workers'

compensation claim.  *Id.*, 1996 WL 614353 at *2.  In the second grievance, the plaintiff wanted to

be "made whole for 'unjust termination'."  *Id.*  The plaintiff subsequently filed a complaint in

federal court alleging that her employer (1) wrongfully discharged her, (2) violated public policy

by discriminating against her for pursuing a wrongful termination claim, (3) violated a Kentucky

statute by discriminating against her for pursuing a workers' compensation claim, (4) committed the

tort of intentional infliction of emotional distress, and (5) violated its duty of good faith and fair

dealing.  *Id.* at *1.  The district court found that the plaintiff's first three claims were barred because:

the claims raised in the first grievance were identical to the second and third claims raised in the

federal lawsuit; the claim raised in the second grievance was identical to the first claim raised in the

federal lawsuit; the parties reached an accord and satisfaction when Morris accepted the severance

package; and that, as a result of this settlement, she could not bring those same claims in the federal

lawsuit.  *Id.* at *1-*2.

On appeal, the Sixth Circuit rejected the plaintiff's argument that the settlement of

the union grievances did not bar her claims alleged in the federal lawsuit:

> Morris appears to premise her first argument, i.e., that the claims are not
> barred by accord and satisfaction, on her view that the claims of discriminatory
> conduct contained in her complaint are not preempted by federal labor law or by
> ERISA, and therefore, her settlement of those claims through the grievance process
> does not preclude her from raising them in this action.  The district court did not
> address the preemption issue because it concluded, correctly, that the disputed and

10

unliquidated claims had been conclusively settled and were therefore barred. *See Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 859 (5th Cir.1975) (holding that employee who freely settles an unliquidated demand with employer may not sue the same employer at a later date on the same cause of action), *cert. denied*, 425 U.S. 944 (1976); *Anderson v. Frank*, 755 F.Supp. 187, 189 (E.D.Mich.1991) (holding that a voluntary settlement of a grievance claim bars any further proceedings in the district court on the same claim if the request for relief in both cases is the same) (citing *Strozier v. General Motors Corp.*, 635 F.2d 424 (5th Cir.1981) (holding that employee's acceptance of settlement with respect to his claims of discrimination barred his lawsuit under civil-rights statutes)). The issue here is not whether the claims are preempted by federal law, but whether they are barred because of the settlement agreement. The claims are clearly barred, and the preemption case law relied upon by Morris is simply inapposite.

*Id.*

In *Kirby v. Dole*, 736 F.2d 661, 664 (11th Cir. 1984), the court reached a similar result in a case which arose from the settlement of age discrimination and retaliation claims against the Federal Aviation Administration ("FAA") filed with the EEOC. After an alleged breach of the settlement agreement, the plaintiff reinstated the EEOC complaint. *Kirby*, 736 F.2d at 662-63. In addition, the plaintiff filed an action in the federal district court under the Age Discrimination in Employment Act ("ADEA"), seeking among other relief, specific enforcement of the settlement agreement with the FAA. *Id.* The district court granted defendant's motion for summary judgment on the ADEA claim. *Id.* at 663. The court of appeals affirmed, rejecting the plaintiff's claim on "the established principle that one who agrees to settle his claim cannot subsequently seek both the benefit of the settlement and the opportunity to continue to press the claim he agreed to settle." As the court explained:

In *Strozier*, the plaintiff filed suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e-2000e-17, and 42 U.S.C.A. § 1981, claiming that his employer took certain allegedly discriminatory action against him. 635 F.2d at 425. The district court granted the employer's motion for summary judgment on the ground that the plaintiff had previously settled his discrimination claims. *Id.* The former Fifth Circuit affirmed. *Id.* In reaching its holding, the Court rejected the

proposition that " 'an aggrieved employee who freely settles his or her unliquidated demand with the employer . . . may reciprocate by suing the same defendant at a later date on the same cause of action, merely because the employee grows dissatisfied with the payment for which he or she settled'." *Id.* at 426 (quoting *Allegheny-Ludlum*, *supra*, at 858).

*Id.*

In *Morris* and *Kirby*, the courts barred the plaintiff's federal court actions because the discrimination claims raised in those actions were settled in other forums. In *Morris*, the discrimination action was settled by an agreement reached as part of the plaintiff's union grievance process, while in *Kirby* the discrimination claim was settled as part of the EEOC action. The present case is similar in that plaintiff's wrongful termination claim was settled as part of the union grievance process. However, the present case is distinguishable from both *Morris* and *Kirby* because plaintiff's union grievance did not involve a discrimination claim. Rather, plaintiff's grievance involved a contractual issue, i..e., whether he should have been discharged for violation of a specific work rule. Furthermore, neither *Morris* nor *Kirby* involved a subsequently filed lawsuit alleging race discrimination in violation of Title VII.

The Supreme Court's decision in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), provides guidance with respect to whether plaintiff could waive his Title VII claim as part of the settlement of a grievance brought pursuant to a collective bargaining agreement. In *Alexander*, the plaintiff filed a union grievance for wrongful discharge, which included a claim of racial discrimination. *Alexander*, 415 U.S. at 39-43. After an arbitrator denied the grievance, the plaintiff filed a federal action alleging that he was discharged due to a racially discriminatory employment practice in violation of Title VII. *Id.* at 43. The district court granted defendant's motion for summary judgment, finding that the plaintiff "voluntarily elected to pursue his grievance

12

to final arbitration under the nondiscrimination clause of the collective-bargaining agreement, was bound by the arbitral decision and thereby precluded from suing his employer under Title VII." *Id.* The district court's decision was affirmed on appeal. *See Alexander v. Gardner-Denver Co.*, 466 F.2d 1209 (10th Cir. 1972).

The Supreme Court reversed, concluding that "Title VII's purpose and procedures strongly suggest that an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement." *Alexander*, 415 U.S. at 47. The court continued,

> In reaching the opposite conclusion, the [d]istrict [c]ourt relied in part on the doctrine of election of remedies. That doctrine, which refers to situations where an individual pursues remedies that are legally or factually inconsistent, has no application in the present context. In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums. . .

*Id.* at 49-51 (internal citations and footnotes omitted). In reaching this determination, the Supreme Court observed that while "presumably an employee may waive his cause of action under Title VII as part of a voluntary settlement," the plaintiff and the defendant "did not enter into a voluntary settlement expressly conditioned on a waiver of [the plaintiff's] cause of action under Title VII." *Id.* at 52 and n. 15.

Here, plaintiff did not raise a discrimination claim in his union grievance. While the July 2008 agreement settled plaintiff's wrongful discharge claim arising from a violation of a work rule, that agreement did not settle, waive or otherwise address his rights to bring a race

discrimination claim under Title VII.  Under these circumstances, plaintiff's Title VII claim is

neither precluded under the reasoning set forth in *Morris* and *Kirby*, nor waived by the settlement

agreement as contemplated by *Alexander*.  Accordingly, defendant's motion for summary judgment

will be denied on this ground.

### 4.    Plaintiff's race discrimination claim (Count I)

### a.    Single motive v. mixed motive

Plaintiff's complaint does not cite the specific statutes upon which he relies in

bringing his race discrimination claim.  In his response to defendant's motion for summary

judgment, plaintiff presented two alternative arguments.  First, plaintiff argued that his claim could

survive as a "single motive" claim under Title VII's general anti-discrimination provision, 42 U.S.C.

§ 2000e-2(a)(1), which provides that it is an unlawful employment practice for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate
> against any individual with respect to his compensation, terms, conditions, or
> privileges of employment, because of such individual's race, color, religion, sex, or
> national origin.

§ 2000e-2(a)(1).   Second, plaintiff argued that his claim could survive under a "mixed motive"

theory under a 1991 amendment, 42 U.S.C. § 2000e-2(m), which provides that:

> Except as otherwise provided in this subchapter, an unlawful employment
> practice is established when the complaining party demonstrates that race, color,
> religion, sex, or national origin was a motivating factor for any employment practice,
> even though other factors also motivated the practice.

§ 2000e-2(m).  *See Gross v. FBL Financial Services, Inc.*, -- U.S. --, 129 S.Ct. 2343, 2347 (2009)

(in a "mixed motive" discrimination case under 42 U.S.C. § 2000e-2(m), "an employee alleges that

he suffered an adverse employment action because of both permissible and impermissible

considerations").

In *Wright v. Murray Guard, Inc.*, 455 F.3d 702 (6th Cir. 2006), the court explained

the evolution of the "mixed motive" theory of discrimination under Title VII:

> Individual disparate-treatment claims brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2, are often categorized as either single-motive claims, i.e., when an illegitimate reason motivated an employment decision, or mixed-motive claims, when "both legitimate and illegitimate reasons motivated the decision," *Desert Palace v. Costa*, 539 U.S. 90, 93, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). The Supreme Court first recognized the mixed-motive theory in *Price Waterhouse v. Hopkins*, where the Court held, in a plurality opinion, that a plaintiff could shift the burden of proof to the employer to prove an affirmative defense upon a showing that the protected characteristic "'played a motivating part in an employment decision.'" *Desert Palace*, 539 U.S. at 93, 123 S.Ct. 2148 (*quoting Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion)). The employer would then be held liable unless it " 'prov[ed] by a preponderance of the evidence that it would have made the same decision even if it had not taken plaintiff's [protected trait] into account.'" *Id.* (quoting *Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. 1775).
>
> Then, in an attempt " 'to eliminate the employer's ability to escape liability in Title VII mixed-motive cases by proving that it would have made the same decision in the absence of the discriminatory motivation,'" *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 n. 8 (5th Cir.2004) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir.2004)), Congress enacted the 1991 Civil Rights Act ("the 1991 Act"), which amended Title VII, Pub.L. No. 102-166, § 107, 105 Stat. 1071, 1075-76 (1991) (codified at 42 U.S.C. §§ 2000e-2(m) and 2000e-5(g)(2)(B)). One of the new statutory provisions codified the mixed-motive "alternative for proving that an 'unlawful employment practice' has occurred." *Desert Palace*, 539 U.S. at 94, 123 S.Ct. 2148 (quoting 42 U.S.C. § 2000e-2(m)). The provision states that a plaintiff can raise a mixed-motive Title VII claim by "demonstrat[ing] that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). If the plaintiff makes such a showing, she is entitled to relief. However, the 1991 Act also provides that the employer's liability will be limited to injunctive and declaratory relief and attorney fees and costs if the employer can establish that it "would have taken the same action in the absence of the impermissible motivating factor." *Id.* § 2000e-5(g)(2)(B). The declaratory and injunctive relief may not include "an order requiring any admission, reinstatement, hiring, promotion, or payment." *Id.* § 2000e-5(g)(2)(B)(ii).

*Wright*, 455 F.3d at 711-12.

Given this history, the Sixth Circuit has held that the *McDonnell Douglas/Burdine*[4] burden-shifting framework applicable to a single motive discrimination claim under Title VII does not apply to the summary judgment analysis of a mixed motive discrimination claim. *White v. Baxter Healthcare Corporation*, 533 F.3d 381, 400 (6th Cir. 2008). Rather, a more lenient standard applies when deciding a motion for summary judgment directed at a mixed motive claim:

> [T]o survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) "race, color, religion, sex, or national origin was a motivating factor" for the defendant's adverse employment action. 42 U.S.C. § 2000e-2(m) (emphasis added). . . . This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim. . .

*Id.*

At some point in the proceedings, the district court must decide whether a particular case involves mixed motive claim as opposed to a single motive claim. *See Price Waterhouse*, 490 U.S. at 247 at n. 12. Because a different, more lenient summary judgment standard applies to a "mixed motive" claim, it is appropriate for the court to make this decision at the summary judgment stage. *See, e.g., Spees v. James Marin, Inc.*, -- F.3d --, 2010 WL 3119969 at *7-8 (6th Cir. Aug 10, 2010) (characterizing plaintiff's discrimination claim as a mixed motive claim for purposes of ruling on motion for summary judgment).

After reviewing the record, the court concludes that plaintiff's action involves a mixed motive race discrimination claim. While plaintiff argued that his claim could survive

---

[4] *See McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

summary judgment as both a single motive and mixed motive discrimination claim, Count I of the amended complaint placed the parties on notice that plaintiff's race was only "*a* determining factor," rather than "*the* determining factor," in the adverse employment decision:

> 25. Plaintiff's race was *a* determining factor in the Deputy Warden, Assistant Deputy Warden, Lt. Captain [sic] and the Shift Commander in allowing co-workers to ridicule Plaintiff and in the Deputy Warden's participation in the ridicule.

> 26 Plaintiff's race was *a* determining factor in Defendant's requesting disciplinary action and termination of the Plaintiff.

> 27. Similarly situated white employees were not disciplined or fired for false allegations by persons outside the workplace.

> 28. Similarly situated white employees who were suspended were not the subject of announcements at Role [sic] Call.

> 29. As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has suffered mental anguish, physical and emotional distress, humiliation and embarrassment, and loss of professional reputation.

Amend. Compl. (emphasis added). These allegations, coupled with plaintiff's arguments and a record which reflects substantial evidence that plaintiff was disciplined for a "permissible consideration" (i.e., violation of a work rule with a past history of disciplinary action), lead the court to conclude that plaintiff seeks relief for a mixed motive claim of race discrimination. *See, e.g., Spees*, 2010 WL 3119969 at *8 (concluding that the plaintiff provided notice that she was pursuing mixed motive claims in a Title VII pregnancy discrimination case, where she alleged that her pregnancy "was *a* motivating factor in [the employer's] treatment of her" and stated that she was pursuing mixed motive claims in her motion for summary judgment and reply brief) (emphasis in original). Accordingly, the court will review plaintiff's claim as one for mixed motive race discrimination under 42 U.S.C. § 2000e-2(m).

### b.       Discussion

It is undisputed defendant took an adverse employment action against plaintiff, i.e., the termination of employment on May 22, 2008. Plaintiff's claim of race discrimination is based upon two incidents. First, Deputy Warden Lt. Clark made an announcement to the correctional facility's staff that plaintiff was on a Stop Order due to making a false police report. Second, the Deputy Warden posted a copy of the Stop Order at the correctional facility's entrance, which contained a picture of plaintiff altered to look like "Mr. T." This altered picture included a "cartoon speech bubble" stating as follows, "Mr. T (White) says 'I pity the fool who files false reports.'" *See* docket no. 1-3. However, plaintiff has provided no evidence that his race was "a motivating factor" in this  employment decision.

At his deposition, plaintiff could not identify any past supervisors who made racially derogatory statements. *See* Plaintiff's Deposition at pp. 35-36 (docket no. 14-3). Plaintiff identified Lieutenant Engmark as a person who discriminated against him, but could not give any example of such conduct other than stating that Engmark personally walked him down from the hospital and "smirked" at him (referring to the May 2007 incident at Sparrow Hospital, which is not a part of this action). *Id.* at pp. 36-37. While plaintiff identified Lieutenant Clark as the supervisor who announced his name as being on a stop order at roll call, plaintiff did not witness the event. *Id.* at pp. 37-38. While plaintiff testified that "there was a supervisor who had a drawing of my stop order making fun in the control center of me [sic], which I felt was inappropriate," he was not at work when the drawing was displayed. *Id.* at pp. 38-9. Rather, plaintiff testified that "a guy who was in there when the supervisor came in there with the jokes and laughing and so on . . . called me at

home and told me about the situation." *Id.* Plaintiff does not even know the name of person who made the drawing. As he explained:

> I just know that it was a supervisor and four or five officers in the control center thinking it was funny, drawing a picture of me with Mr. T with a Mohawk and, you know, saying I pity the fool, whatever, for falsifying this and that, you know, not even knowing the truth of the whole matter. I was being made of a joke [sic].

*Id.* Plaintiff admitted that he did not see a picture of the drawing posted in the control center, but that Corrections Officer Decker saw it and gave him a copy. *Id.* at pp. 39-41. Three other Corrections Officers, i.e., Sanchez, See and Duncan, told plaintiff about the drawing. *Id.* at p. 42.

Plaintiff admitted that: he did not see anyone draw the picture on the stop order; that he did not personally see the stop order posted anywhere; that while stop orders are posted in two places, he did not know whether the stop order with the drawing was posted in the control center; that he was aware of only one copy of the stop order that had the drawing; and that he "did not see or hear any individuals making a joke about the stop order or the drawing." *Id.* at pp. 40-41. While plaintiff has presented hearsay evidence of what four Corrections Officers told him about the drawing, he has failed to present any affidavits or deposition testimony from these four officers (or anyone else). "A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." *Sperle v. Michigan Department of Corrections*, 297 F.3d 483, 495 (6th Cir. 2002). *See also, Weberg v. Franks*, 229 F.3d 514, 526 n. 13 (6th Cir.2000) (while statements in a verified complaint may function as the equivalent of affidavit statements for purposes of summary judgment, court disregarded plaintiff's allegations in a verified complaint because they were based upon hearsay rather than personal knowledge); Fed.R.Civ.P. 56(e)(1) ("[a] supporting or opposing affidavit must be made on personal knowledge,

set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated").

Viewing the evidence in the light most favorable to plaintiff, the court finds that he has failed to establish a prima facie case of mixed motive race discrimination. Plaintiff was not at the correctional facility to witness the alleged incident at roll call or the alleged posting of the Mr. T drawing. Plaintiff has not presented any affidavits, deposition transcripts or other evidence to support his claim that the incidents occurred as alleged or were motivated by his race. Furthermore, the only evidence connecting the "Mr. T Stop Order" to the Deputy Warden is hearsay from correctional officers who have neither testified nor submitted affidavits. Because plaintiff has not presented any admissible evidence that race was a motivating factor in the adverse employment action, there is no genuine issue of fact before the court on his race discrimination claim. *See Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (party moving for summary judgment does need not support its motion with evidence disproving the nonmoving party's claim, but need only point out to the court that there is an absence of evidence to support that claim). Accordingly, defendant is entitled to summary judgment on this claim.

### 5. Plaintiff's hostile work environment claim (Count II)

"Title VII offers employees protection from a 'workplace [ ] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . .'" *Barrett v. Whirlpool Corporation*, 556 F.3d 502, 514 (6th Cir. 2009), quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). To defeat defendant's motion for summary judgment, plaintiff must adduce direct or circumstantial evidence of

discrimination. *Barrett*, 556 F.3d at 514. "Direct evidence is evidence that, if believed, dictates a finding, with no need to draw inferences, that 'unlawful discrimination was at least a motivating factor in the employer's actions.'" *Id.* at 515, quoting *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006).

When a plaintiff relies on circumstantial evidence in a hostile work environment claim, the *McDonnell Douglas/Burdine* burden-shifting approach applies. *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). Under this burden-shifting framework, a plaintiff must first set forth a *prima facie* case of discrimination. *Newman v. Federal Express Corporation*, 266 F.3d 401, 405 (6th Cir. 2001). If the plaintiff establishes a *prima facie* case, then the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. *Id.* If the employer meets this burden, then the plaintiff must prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination. *Id.* Under this framework, "[t]he ultimate burden of persuasion remains at all times with the plaintiff." *Id.* Plaintiff has not presented any direct evidence of race discrimination. Accordingly, he must demonstrate discrimination under the *McDonnell Douglas/Burdine* framework.

In order to establish a *prima facie* case of hostile work environment based on race, plaintiff must establish five elements: (1) he was a member of a protected class; (2) he was subjected to unwelcomed harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. *Clay*, 501 F.3d at 706; *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). *See also, Scott v. G & J Pepsi-Cola Bottlers, Inc.*, No. 09-5683, 2010 WL 3245539 at *2 (6th Cir. Aug. 13, 2010) (unpublished). The

conduct complained of "must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Jackson v. Quanex Corporation*, 191 F.3d 647, 658-59 (6th Cir. 1999), quoting *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997).

> [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris*, 510 U.S. at 23. "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious)" will not amount to discriminatory changes in the employee's terms and conditions of employment sufficient to support a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation omitted). *See, e.g., Smith v. Leggett Wire Company*, 220 F.3d 752, 760 (6th Cir. 2000) (where the plaintiff worked at a factory from 1974 to 1994, the court rejected his claim of a hostile work environment, finding that "a racial slur in 1974 by an unknown coworker, a racially offensive and obscene cartoon passed around in the late 1980's or early 1990's by one who was not involved in [the plaintiff's] termination decision, [a supervisor's] racist joke sometime after 1993, and [a supervisor's] reference to a black employee as a 'gorilla' - is simply not 'severe or pervasive enough' to create an objectively hostile work environment").

Viewing the evidence in the light most favorable to plaintiff, the court finds that plaintiff failed to establish a prima facie case of hostile work environment based on race. As an initial matter, plaintiff's EEOC complaint was limited to harassment by management that occurred

*after* his reinstatement on July 24, 2008. *See* docket no. 14-5. As previously discussed, the relevant time frame for this hostile work environment claim was July 24, 2008 through December 4, 2008. Two of the alleged incidents of harassment, i.e., the May 2007 hospital incident and the Mr. T drawing on the stop order, are not relevant to plaintiff's claim because they occurred *before* plaintiff's reinstatement on July 24, 2008. *See id.* at p. 109. Plaintiff also testified that he was being harassed about prisoner "count errors." *Id.* at pp. 106-09. However, plaintiff testified that this alleged harassment started in December 2009, approximately one year *after* the EEOC issued the RTS letter and approximately nine months after plaintiff filed this action. *Id.* Thus, this alleged harassment occurred long after the resolution of the EEOC complaint.

The only potential incident of harassment that arose during the relevant time period was plaintiff's claim of mistreatment after he was "about to be assaulted" by a prisoner and took steps to restrain the prisoner. Plaintiff's Dep. at pp. 104-07 (docket nos. 14-3 and 14-4). When the prisoner later claimed that plaintiff threatened him, plaintiff was accused by supervisors of lying about the situation. *Id.* While plaintiff did not identify the date of this occurrence, it appears to be the hostile work environment claim alleged in the EEOC complaint, i.e., "I was told that an investigation has been conducted regarding statements made against me by an inmate, who assaulted me." *See* docket no. 14-5. The only claim of harassment that could conceivably have occurred between July 24, 2008 and December 4, 2008 was the claim that a supervisor accused plaintiff of lying about threatening a prisoner. This isolated incident, which did not appear to result in any change in plaintiff's employment condition, is insufficient to establish a prima facie case of a hostile work environment based upon race. Furthermore, plaintiff cannot establish a *prima facie* case of a hostile work environment even if the court considered plaintiff's claim of harassment related to

the count errors. When asked if he thought the "issues with the count errors" were based on his race, plaintiff testified, "I don't know. I can't say if it is or if it isn't, but I doubt it." Plaintiff's Dep. at p. 109. Accordingly, defendant is entitled to summary judgment on this claim.

**V.  Conclusion**

Defendant's motion for summary judgment (docket no. 13) will be **GRANTED**. An order consistent with this opinion shall be issued forthwith.


Dated:  September 17, 2010                     /s/ Hugh W. Brenneman, Jr.
                                               HUGH W. BRENNEMAN, JR.
                                               United States Magistrate Judge